BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

RUPA BHATTACHARYYA
Director
Torts Branch, Civil Division

ANDREA W. MCCARTHY
Senior Trial Counsel
Torts Branch, Civil Division

DAVID G. CUTLER
Illinois State Bar No. 6303130
United States Department of Justice
Torts Branch, Civil Division
P.O. Box 7146
Washington, D.C. 20044-7146
Tel:  (202) 616-0674
Fax:   (202) 616-4314
Email: david.g.cutler@usdoj.gov

WENDY J. OLSON
Idaho State Bar No. 7634
United States Attorney

NICHOLAS J. WOYCHICK
Idaho State Bar No. 39120
Assistant United States Attorney
Email: Nick.Woychick@usdoj.gov

*Attorneys for the United States*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **THE ESTATE OF JAMES LEE DIMAGGIO, et. al,**<br><br>    **Plaintiffs.**<br>**v.**<br><br>**SIX UNKNOWN FBI AGENTS, et. al,**<br><br>    **Defendants.** | **Case No. 1:15-cv-311-REB**<br><br>**MEMORANDUM IN SUPPORT OF THE UNITED STATES' MOTION TO DISMISS** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 1

DISCUSSION ......................................................................................................... 6

I.    Robinson Has Not Demonstrated That She May Sue As Personal Representative................ 6

II.   The Estate's Common-Law Claims Abated Upon DiMaggio's Death .................................. 8

III.  Robinson Fails To Plausibly Allege A Wrongful Death Claim Under Idaho Law ............. 9

   A.  Robinson Fails To Sufficiently Allege Financial Dependency On DiMaggio .................. 10

   B.  Robinson Fails To Sufficiently Allege That DiMaggio's Death Was Caused By A
       Wrongful Act That Was Not Justified Or Otherwise Privileged In Idaho......................... 11

CONCLUSION....................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Russell*,
    247 F.3d 125 (4th Cir. 2001) ................................................ 19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ....................................................... 9, 10, 13, 15

*Barnes v. Union Pac. R. Co.*,
    139 F. Supp. 198 (D. Idaho 1956) ...................................... 7, 8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................ 10

*Bevan v. Vassar Farms, Inc.*,
    793 P.2d 711 (Idaho 1990) ............................................... 16

*Billington v. Smith*,
    292 F.3d 1177 (9th Cir. 2002) .......................................... 16

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
    403 U.S. 388 (1971) ......................................................... 5

*Brown v. Electronic Arts, Inc.*,
    724 F.3d 1235 (9th Cir. 2013) ............................................ 4

*Castorena v. Gen. Elec.*,
    238 P.3d 209 (Idaho 2010) ............................................... 11

*Colony Cove Properties, LLC v. City Of Carson*,
    640 F.3d 948 (9th Cir. 2011) ............................................. 4

*Craig v. Gellings*,
    219 P.3d 1208 (Idaho Ct. App. 2009) ................................ 9

*Daniels-Hall v. Nat'l Educ. Ass'n*,
    629 F.3d 992 (9th Cir. 2010) ............................................. 13

*De Saracho v. Custom Food Mach., Inc.*,
    206 F.3d 874 (9th Cir. 2000) ............................................. 6

*Desfosses v. Keller*,
    667 F. Supp. 2d 1210 (D. Idaho 2009) .............................. 1

*Estate of Bergman v. E. Idaho Health Servs., Inc.*,
    No. 4:13-CV-00202-BLW, 2015 WL 506566 (D. Idaho Feb. 6, 2015) .................. 9

*Estate of Crawley v. McRae*,
    No. 1:13-CV-02042-LJO, 2015 WL 5432787 (E.D. Cal. Sept. 15, 2015) ............ 17

*Estate of Martinez v. City of Fed. Way*,
    105 F. App'x 897 (9th Cir. 2004) ...................................... 19

*Farm Bureau Mut. Ins. Co. of Idaho v. Eisenman*,
  286 P.3d 185 (Idaho 2012)........................................................................... 9, 10, 20

*Forrett v. Richardson*,
  112 F.3d 416 (9th Cir. 1997) ............................................................................ 18, 19

*Garcia v. Santa Clara Cty.*,
  268 F. App'x 588 (9th Cir. 2008) ..................................................................... 16, 18

*Gasho v. United States*,
  39 F.3d 1420 (9th Cir. 1994) ............................................................................... 6, 20

*Graham v. Connor*,
  490 U.S. 386 (1989)............................................................................................ 17, 19

*Hoagland v. Ada Cty.*,
  303 P.3d 587 (Idaho 2013).......................................................................................... 8

*Hunter v. Bryant*,
  502 U.S. 224 (1991)..................................................................................................... 15

*Hydrick v. Hunter*,
  669 F.3d 937 (9th Cir. 2012) ..................................................................................... 19

*In re Carrier IQ, Inc., Consumer Privacy Litig.*,
  78 F. Supp. 3d 1051 (N.D. Cal. Jan. 21, 2015)......................................................... 4

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014),
  *cert. denied sub nom. Cohen v. NVIDIA Corp.,* 135 S.Ct. 2349 (2015) ..................... 5

*Johnson v. Cty. of Los Angeles*,
  340 F.3d 787 (9th Cir. 2003) ..................................................................................... 18

*Kinney v. Indiana Youth Ctr.*,
  950 F.2d 462 (7th Cir. 1991) ..................................................................................... 19

*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005) .................................................................................. 4, 5

*Krieg v. Mills*,
  8 F. App'x 663 (9th Cir. 2001) .................................................................................. 20

*Leong v. City of Detroit*,
  151 F. Supp. 2d 858 (E.D. Mich. 2001)................................................................... 19

*Long v. City & Cty. of Honolulu*,
  511 F.3d 901 (9th Cir. 2007) ..................................................................................... 18

*Makaeff v. Trump Univ., LLC*,
  715 F.3d 254 (9th Cir. 2013) .................................................................................. 3, 4

*Mann v. De Moss*,
  323 F. Supp. 1126 (S.D. Iowa 1971) .......................................................................... 8

*Maune v. Bankers Life & Cas. Ins. Co.*,
  No. 4:10-CV-00074-BLW, 2010 WL 1435350 (D. Idaho Apr. 7, 2010)............... 10

*Michaels v. United States*,
    No. SACV 13-00941 JVS, 2014 WL 2599894 (C.D. Cal. May 8, 2014) ................................. 1

*Montoute v. Carr*,
    114 F.3d 181 (11th Cir. 1997) ................................................................... 19

*Moreland v. Las Vegas Metro. Police Dep't*,
    159 F.3d 365 (9th Cir. 1998) ...................................................................... 6

*Nebeker v. Piper Aircraft Corp.*,
    747 P.2d 18 (Idaho 1987) ...................................................................... 8, 10

No. 1:09-CV-00671-EJL,
    2012 WL 3651138 (D. Idaho Aug. 23, 2012) ............................................... 15

*O'Guin v. Bingham Cty.*,
    72 P.3d 849 (Idaho 2003) ....................................................................... 10

*Pantano v. United Med. Labs., Inc.*,
    456 F.2d 1248 (9th Cir. 1972) ................................................................ 6, 7

*Pfau v. Comair Holdings, Inc.*,
    15 P.3d 1160 (Idaho 2000) ..................................................................... 10

*Ret. Sys. v. Sterling Fin. Corp.*,
    963 F. Supp. 2d 1092 (E.D. Wash. 2013) ..................................................... 5

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
    442 F.3d 741 (9th Cir. 2006) .................................................................... 1

*Schwarder v. United States*,
    974 F.2d 1118 (9th Cir. 1992) ................................................................... 6

*Scissons v. United States*, No. CV03-0531-S-E
    JL, 2006 WL 3147712 (D. Idaho Nov. 1, 2006) ............................................. 8

*Scott v. Harris*,
    550 U.S. 372 (2007) ..................................................................... 15, 16, 18

*Scott v. Henrich*,
    39 F.3d 912 (9th Cir. 1994) ............................................................... 17, 19

*Scott v. Illinois*,
    440 U.S. 367 (1979) ............................................................................. 15

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 *opinion amended on denial of reh'g,* 275 F.3d 1187 (9th Cir. 2001) .... 13, 14, 17

*State v. Baker*,
    644 P.2d 365 (Idaho Ct. App. 1982) ......................................................... 12

*State v. Camarillo*,
    678 P.2d 102 (Idaho Ct. App. 1984) ......................................................... 12

*State v. Hall*,
    No. 40916, 2015 WL 6159918 (Idaho Ct. App. Oct. 21, 2015) ........................... 11

-iv-

*State v. Rodriguez*,
   460 P.2d 711 (Idaho 1969)..................................................................... 12

*State v. Varie*,
   26 P.3d 31 (Idaho 2001)......................................................................... 12

*State v. Wilson*,
   243 P. 359  (Idaho 1925)......................................................................... 12

*Steckman v. Hart Brewing, Inc.*,
   143 F.3d 1293 (9th Cir. 1998) ............................................................... 15

*Sugai v. Gen. Motors Corp.*,
   130 F. Supp. 101 (D. Idaho 1955) ......................................................... 11

*Summers v. Interstate Tractor & Equip. Co.*,
   466 F.2d 42 (9th Cir. 1972) ................................................................. 6, 7

*Tekle v. United States*,
   511 F.3d 839 (9th Cir. 2007) ................................................................. 12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................................. 5

*Tennessee v. Garner*,
   471 U.S. 1 (1985)............................................................................. 18, 19

*Ting v. United States*,
   927 F.2d 1504 (9th Cir. 1991) ............................................................... 12

*Tortolano v. Poulson*,
   No. 1:13-CV-00438-EJL, 2015 WL 4623799 (D. Idaho Aug. 3, 2015)................... 15

*United States v. Ritchie*,
   342 F.3d 903 (9th Cir. 2003) ................................................................... 4

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
   592 F.3d 954 (9th Cir. 2010) ................................................................... 3

*Vulk v. Haley*,
   736 P.2d 1309 (Idaho 1987)................................................................... 20

*Wicklund v. Page*,
   No. 1:09-CV-671-EJL-CWD, 2012 WL 3647960 (D. Idaho July 18, 2012) .......... 15

*Young v. Cty. of Los Angeles*,
   655 F.3d 1156 (9th Cir. 2011) ............................................................... 17

## Statutes

28 U.S.C. § 1346(b) ........................................................................................ 5

28 U.S.C. § 2674............................................................................................ 20

28 U.S.C. § 2676............................................................................................ 20

Idaho Code Ann. § 5-311 ............................................................................................. 9

Idaho Code Ann. § 5-327 ............................................................................................. 8

Idaho Code Ann. § 6-808 ........................................................................................... 11

Idaho Code Ann. § 6-904 ........................................................................................... 12

Idaho Code Ann. § 15-3-103 ........................................................................................ 7

Idaho Code Ann. § 15-4-204 ........................................................................................ 7

Idaho Code Ann. § 15-4-205 ........................................................................................ 7

Idaho Code Ann. § 18-4009 ....................................................................................... 11

Iowa Code §§ 633.148-633.149 ................................................................................... 8

**Rules**

Fed. R. Civ. P. 17(b)(3) ................................................................................................ 6

**Treatises**

4-17 *Moore's Federal Practice* - Civil § 17.22 ............................................................ 7

Capacity to Sue or be Sued—Representatives and Fiduciaries, 6A Charles Alan Wright, et al,
    *Fed. Prac. & Proc. Civ.* § 1565 (3d ed. 2015) .......................................................... 7

## INTRODUCTION

James Lee DiMaggio was suspected of abducting a sixteen-year-old girl and bludgeoning and then incinerating the girl's mother and eight-year-old brother.  ECF No. 10, Am. Compl. ¶¶ 19, 24-32.  He led rescuers on a week-long manhunt from the Mexican border to the Idaho wilderness.  *Id.* ¶¶ 24-39.  When rescuers finally located and approached DiMaggio's remote hideout, DiMaggio opened fire and was killed.  *Id.* ¶¶ 40-42.  The complaint speaks for itself: our government's response to gunshots fired by a suspected killer and kidnapper was justified, reasonable, and lawful.  The claims against the United States should be dismissed with prejudice.

## BACKGROUND

Hannah Anderson went missing on August 3, 2013.  Am. Compl. ¶ 24.  The day after Hannah disappeared, surveillance video captured her riding with James Lee DiMaggio in his car.  *Id.* ¶ 28.  DiMaggio was forty-years old.  *Id.* ¶ 18.  Hannah was sixteen.  *Id*. ¶ 19.  Later in the evening on August 4, officers responded to a fire at DiMaggio's residence.  *Id.* ¶ 26.  Underneath the rubble they discovered the bodies of two deceased individuals.  *Id.* ¶ 27.

At 3:38 a.m. on August 5, the San Diego Sheriff's office applied telephonically for a search warrant for DiMaggio's residence.  *See generally* Search Warrant, *California v. James Lee DiMaggio*, CR 13139852 (Super. Ct. of California, San Diego County) (Aug. 5, 2013) (Exh. A); Tr. Telephonic Search Warrant Conference at 1:1-6 (Aug. 5, 2013) (Exh. B).[1]  Investigators suspected that the victims were killed by "blunt force trauma" before DiMaggio's residence was set ablaze.  Exh. B at 7-8.  Given the violent nature of the crimes, no second could be spared:

---

[1] The Court "may take judicial notice of court filings and other matters of public record." *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (citation omitted); *accord Desfosses v. Keller*, 667 F. Supp. 2d 1210, 1219 n.4 (D. Idaho 2009) (collecting cases); *see also, e.g., Michaels v. United States*, No. SACV 13-00941 JVS, 2014 WL 2599894, at *2 (C.D. Cal. May 8, 2014) (taking judicial notice of search warrants, affidavits, and an order releasing seized assets) (citing Fed. R. Evid. 201(b)).

"[V]iolent criminals are often armed and will use force, even lethal force to avoid prosecution and apprehension. A delay in the search could delay the investigation and apprehension of the suspect who is a potential danger to the public." *Id.* at 6:25-28. The court issued the warrant, and the search began immediately. *Id.* at 9:7-13.

Over the next several days, officers recovered and inventoried dozens of items from DiMaggio's residence, many of which could have been used to commit cruel acts of violence, murder, and arson. *See generally* Receipt and Inventory, *California v. James Lee DiMaggio*, CR 13139852 (Super. Ct. of California, San Diego County) (various dates) (Exh. C). These items included: a crowbar, a baseball bat, incendiary devices, and arson wire. *Id.* Investigators also recovered handcuff boxes, ammunition (shells, cartridges, and empty boxes), and shotgun primer. *Id.* In the meantime, authorities issued a state-wide Amber alert for Hannah and her younger brother Ethan (his whereabouts were then unknown). Am. Compl. ¶ 29.

On August 6, the San Diego County Sheriff's Department applied for an arrest warrant for DiMaggio. *See* Declaration in Support of Arrest Warrant, *California v. James Lee DiMaggio*, CR 13139852 (Super. Ct. of California, San Diego County) (August 6, 2013) (Exh. D). Authorities described the grisly nature of the double-homicide at DiMaggio's residence: Inside the garage, authorities found a victim lying "face down" under a tarp. *Id.* at 2:17-18. The tarp was "partially melted to the head." *Id.* at 2:19. There was a "crow bar and what appeared to be blood on the ground next to the head." *Id.* at 2:21. Officers also discovered a deceased dog lying underneath a sleeping bag with "blood near the head." *Id.* at 2:24-25. Inside the residence, investigators discovered the "burnt remains of a small child." *Id.* at 3:10. The child's "remains could not be identified at the scene due to the condition." *Id.* at 3:10-11. Because there was probable cause to believe that DiMaggio committed these crimes—he also remained the prime

suspect in Hannah's disappearance, *id*. at 3:12-24—the warrant for DiMaggio was issued. *Id*. at 4:12-25. He was wanted for double-murder and arson. *Id*. Bail was set at $1,000,000.00. *Id*.

Later that same day, the autopsy results were finally completed for the victims found at DiMaggio's residence. Am. Compl. ¶¶ 31-32. The first victim was identified as Christina Anderson, Hannah's mother. *Id.* ¶ 31. Christina was murdered by a "blunt force injury to the head." *Id.* ¶ 31. She suffered "12 different abrasions/lacerations on [her] forehead, scalp, and ear." *Id.* Medical examiners also documented a "gaping 5.5 inch incision wound" stretching across Christina's neck. *Id.* The second murder victim was also identified: it was Hannah's brother, Ethan. *Id.* ¶ 32. The precise cause of Ethan's death was "undetermined." *Id.* The only thing left were Ethan's "charred remains." *Id.* Ethan was eight-years-old. *Id.* ¶ 19.

Over the next few days, authorities extended the Amber alert for DiMaggio outside of California and were "very concerned for Hannah." *See* San Diego Kidnapping Suspect May Have Homemade Explosives, available at http://www.nbcsandiego.com/news/local/James-DiMaggio-Hannah-Anderson-Manhunt-Homemade-Explosives-218896411.html (quoting Sheriff's homicide Lt. Glenn Giannantonio).[2] "[S]he is in grave danger." *Id.* They also warned the public not to approach DiMaggio's car, if located, because he might "rig" it with "homemade explosives." *Id.* As authorities expanded their search, they also requested and received additional warrants concerning DiMaggio. *See, e.g.,* Affidavit for Search Warrant, No. 45 141 (August 7, 2013) (explaining that DiMaggio "killed" Hannah's mother and brother and "shot" the family dog before "set[ting] the house on fire" ) (Exh. E at 5:1-2). Rescuers were in a race

---

[2] "Courts may take judicial notice of publications introduced to indicate what was in the public realm at the time, [though] not whether the contents of those articles were in fact true." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (internal quotations omitted) (collecting cases); *accord Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 259 (9th Cir. 2013) (taking judicial notice of newspaper, magazine articles, and web pages).

against the clock: "Hannah Anderson is believed to be in grave danger and being held against her will by DiMaggio." *Id*. at 5:2-3; *see also id.* at 5:13-15 (concluding that DiMaggio is a "significant danger to our community" and poses a "significant risk" to law enforcement).

The Amber alert proved to be a lifesaver. On August 8, a group of horseback riders contacted authorities after they encountered DiMaggio and Hannah in the Frank Church River of No Return Wilderness. Am. Compl. ¶¶ 33-35. Acting on that tip, authorities discovered DiMaggio's car in the wilderness the next day—hidden under "layers of brush." *Id.* ¶ 36.

On August 10 (one week after Hannah went missing), a Marshals Service plane located DiMaggio and Hannah at a remote campsite near Morehead Lake. *Id.* ¶ 38. According to the complaint, Marshals Service video showed DiMaggio and Hannah "waiving [sic] pieces of cloth to get the attention of the plane." *Id.* But the publicly-released video (which is actually video from an FBI plane) depicts only Hannah waving; it does not appear DiMaggio signals the plane.[3]

Members of the "FBI Hostage Rescue Team" converged on the area near where Hannah and DiMaggio had been spotted and hiked toward the campsite. *Id.* ¶ 39. Plaintiffs allege that in an interview on the NBC "Today" show, Hannah said she told DiMaggio to signal for "SOS" by firing a gun in the air three times. *Id.* ¶ 40 (citing "Today" show interview on October 10, 2013).

---

[3] *See* Exclusive: Saving Hannah Anderson: Inside the Dramatic FBI Rescue of Kidnapped 16-Year-Old, http://abcnews.go.com/US/saving-hannah-anderson-inside-dramatic-fbi-rescue-kidnapped/story?id=29089347. Because Plaintiffs rely on the publicly-released surveillance video to support their claim, Am. Compl. ¶ 38, it is incorporated by reference. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (courts may "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment") (collecting cases); *see also, e.g.*, *See Brown v. Electronic Arts, Inc*., 724 F.3d 1235, 1248 n.7 (9th Cir. 2013) (video game submitted as part of the complaint properly considered on motion to dismiss) (citing *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005)); *In re Carrier IQ, Inc., Consumer Privacy Litig.*, 78 F. Supp. 3d 1051, 1078 n.6 (N.D. Cal. Jan. 21, 2015) (citing *Ritchie*, 342 F.3d at 908). In addition, courts "need not accept as true conclusory allegations that are contradicted by documents referred to in the complaint." *Colony Cove Properties, LLC v. City Of Carson*, 640 F.3d 948, 955 (9th Cir. 2011) (collecting cases).

According to the complaint, DiMaggio fired "once into the air." *Id.* ¶ 41. But before DiMaggio could pull the trigger again, he was shot in the "head, chest and extremities." *Id.* ¶ 42. Hannah's *unabridged* statement on "Today" contradicts those allegations: According to Hannah, after DiMaggio fired the first shot, he "lowered" his gun and fired a "second time." "Today" (NBC television broadcast Oct. 20, 2013) (Exh. F at 17).[4] "And then a bunch of guns went off." *Id.*

DiMaggio's sister, Lora Robinson (appearing individually as a plaintiff and also as the representative of DiMaggio's Estate) filed this suit against the federal government and the rescuers who saved Hannah. Counts 1-3 are brought against the unidentified rescuers under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). Those claims are not before the Court on this motion. Counts 4-9 are brought against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b); 2671-2680, and thus are governed by Idaho law. Both Robinson and the Estate allege a statutory wrongful death claim against the government (Count 4); the remaining FTCA claims are brought solely by the estate and allege intentional infliction of emotional distress (Count 5), negligent infliction of emotional distress (Count 6), negligence (Count 7), assault (Count 8), and battery (Count 9). Plaintiffs seek $30 million from the government in compensatory and punitive damages. Am. Compl. "Prayer."

---

[4] Video also *available at*: http://www.today.com/news/exclusive-hannah-anderson-speaks-out-reveals-new-details-kidnapping-6C10975683. Because Plaintiffs cite Hannah's "Today" show interview to describe the events leading up to the shooting, the Court may review her *entire* statement. *See supra* n.3; *see also In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1058 n.10 (9th Cir. 2014) ("Because Plaintiffs incorporate by reference Mr. Hunt's declaration, relying on portions of it in their complaint, we may properly consider the declaration in its entirety.") (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), *cert. denied sub nom. Cohen v. NVIDIA Corp.*, 135 S.Ct. 2349 (2015)); *Knievel*, 393 F.3d at 1076 ("In evaluating the context in which the statement appeared, we must take into account 'all parts of the communication that are ordinarily heard or read with it.'") (quoting Restatement (Second) of Torts § 563 cmt. d (1977)); *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1107 (E.D. Wash. 2013) ("Once a document is deemed incorporated by reference, the entire document is assumed to be true for purposes of a motion to dismiss, and both parties—and the Court—are free to refer to any of its contents.").

**DISCUSSION**

Plaintiffs' FTCA claims are defective under Idaho law and should be dismissed for a host of reasons.[5]  First, Robinson has not established her capacity to sue in Idaho as the representative of DiMaggio's Estate (Counts 4-9).  Second, the Estate's common-law claims (Counts 5-9) abated when DiMaggio died.  Third, Robinson has not demonstrated that she depended financially on DiMaggio as Idaho's wrongful death statute requires.  Fourth, Robinson fails to plausibly allege that DiMaggio's death was caused by a wrongful act not otherwise justified or privileged under the laws of Idaho.  Not only is Robinson's theory of wrongdoing entirely implausible, the complaint demonstrates the opposite: Hannah's rescuers acted reasonably when they shot DiMaggio, a suspected killer and arsonist, after *he* opened fire.

**I.    Robinson Has Not Demonstrated That She May Sue As Personal Representative**

State law governs whether an individual suing in a representative capacity may bring suit in federal court.  Fed. R. Civ. P. 17(b)(3); *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998), as amended (Nov. 24, 1998) ("The party seeking to bring a survival action bears the burden of demonstrating that a particular state's law authorizes a survival action and that the plaintiff meets that state's requirements for bringing a survival action."); *Pantano v. United Med. Labs., Inc.*, 456 F.2d 1248, 1249 (9th Cir. 1972) (same for wrongful death cases).[6]  Traditionally, an estate's representative did "not have capacity to maintain an action outside the

---

[5] Under the FTCA, liability is determined by the tort law of the state where the claim arose.  *Gasho v. United States,* 39 F.3d 1420, 1427 (9th Cir. 1994).  Indeed, the United States is liable only if "a private person[] would be liable to the claimant in accordance with the law of the place where the act or omission occurred," § 1346(b)(1), and only "in the same manner and to the same extent as a private individual under like circumstances" would be liable, *id.* § 2674; *Schwarder v. United* States, 974 F.2d 1118, 1122 (9th Cir. 1992) (same in wrongful death suit).

[6] A litigant's capacity to sue may be challenged "in the responsive pleading or by motion before pleading."  *De Saracho v. Custom Food Mach., Inc.*, 206 F.3d 874, 878 (9th Cir. 2000) (quoting *Summers v. Interstate Tractor & Equip. Co.*, 466 F.2d 42, 49-50 (9th Cir. 1972)).

state of the representative's appointment."  Capacity to Sue or be Sued—Representatives and

Fiduciaries, 6A Charles Alan Wright, et al, *Fed. Prac. & Proc. Civ.* § 1565 (3d ed. 2015); *cf.*

*Barnes v. Union Pac. R. Co.*, 139 F. Supp. 198, 201 (D. Idaho 1956) (dismissing wrongful death

action brought by Oregon administrator because "a foreign administratrix cannot bring a

wrongful death action in a state court in Idaho").  While some states have "relaxed" this rule,

many—including Idaho—still require that a representative "comply with certain conditions, such

as filing a bond or recording a copy of the party's letters of administration with a local official."

§ 1565 (collecting cases); *see also* 4-17 *Moore's Federal Practice* - Civil § 17.22 (observing that

in "many" states, a "foreign representative has capacity to litigate claims arising under state law

only if that person complies with the conditions of the forum state law"); Idaho Code Ann. § 15-

4-205.  Indeed, the representative of a foreign (*i.e.*, non-resident) decedent may bring suit in

Idaho only if certain "conditions" are met.  § 15-4-205.  Among other things, Idaho requires the

representative to file "authenticated copies of his appointment and of any official bond he has

given."  Idaho Code Ann. § 15-4-204.  Only by "filing evidence of his authority with a local

Court" do these provisions "permit a personal representative from another state to obtain the

powers of one appointed locally."  Idaho Code Ann. § 15-3-103, Uniform Law Comments.

   While Robinson alleges she is the "personal representative" of DiMaggio's California

estate, she does not further allege or demonstrate compliance with Idaho law regarding non-

resident representatives.  Am. Compl. ¶¶ 7-8.  Because Idaho law requires the representative of a

non-resident decedent to file evidence of his or her authority in Idaho—making no exception for

wrongful death claims—the Estate's claims should be dismissed.  *See Summers*, 466 F.2d at 49

(observing that wrongful-death "plaintiff, as executrix of a foreign estate, lacked the capacity to

bring this action in the courts of Oregon . . . .") (citing *Pantano*, 456 F.2d 1248)); *Barnes*, 139 F.

-7-

Supp. at 201; *cf. Nebeker v. Piper Aircraft Corp.*, 747 P.2d 18, 20 (Idaho 1987) (dismissing

wrongful death action because children were not proper "heirs" and "[t]he objective served by

the wrongful death statute dovetails with our *probate*, community property, and child support

laws") (emphasis added); *Scissons v. United States*, No. CV03-0531-S-EJL, 2006 WL 3147712,

at **2-3 (D. Idaho Nov. 1, 2006) (dismissing deadly-force *Bivens* claim because plaintiffs were

not appointed representatives of estate).[7]

## II.      The Estate's Common-Law Claims Abated Upon DiMaggio's Death

Even if Robinson demonstrates that she may sue in a representative capacity in Idaho, the

Estate's common-law claims (Counts 5-9) fail for a more simple reason: they did not survive

DiMaggio's death.  "At common law in Idaho, a personal tort cause of action abates with the

death of the plaintiff."  *Hoagland v. Ada Cty.*, 303 P.3d 587, 596 (Idaho 2013).  Until recently,

the common-law abatement "rule ha[d] only been modified to the extent that wrongful death

claims are permissible by statute."  *Id.*  While the Idaho legislature again tweaked the common-

law rule (in July 2010) to preserve past death certain personal-injury and property claims, the

amendment included an important caveat: such claims "shall *not* abate upon the death of the

injured person from causes *not* related to the wrongful act or negligence."  Idaho Code Ann. § 5-

327(2) (2010). (emphasis added).  The upshot is that wrongful or negligent acts that *do* cause

death still abate under Idaho law.  *See id.*  Quite simply, "a decedent's estate is not legally

---

[7] *See also Mann v. De Moss*, 323 F. Supp. 1126, 1128 (S.D. Iowa 1971) (dismissing with prejudice wrongful death claim brought by foreign administrator and observing that "[t]he majority of the cases in comparable situations have held that the failure of the foreign fiduciary to comply with the state statute within the applicable statute of limitations is a complete bar to the maintenance of such action") (collecting cases).  In fact, the ancillary-administration statutes in effect in Iowa when *Mann* was decided were analogous to Idaho's present-day provisions and required a non-resident administrator to file with "the court an authenticated copy of his appointment, and of his official bond, if he has given a bond."  *Id.* at 1126-27 (citing then-current Iowa Code §§ 633.148-633.149).

entitled to recover damages [under any theory] for the decedent's wrongful death." *Farm Bureau Mut. Ins. Co. of Idaho v. Eisenman*, 286 P.3d 185, 189-90 (Idaho 2012). "[O]nly the decedent's heirs may recover those damages" (or a representative acting on behalf of the heirs) through a *wrongful death action* authorized by Idaho Code Ann. § 5-311. *Id.*; *see also Craig v. Gellings*, 219 P.3d 1208, 1210 (Idaho Ct. App. 2009) (Section 5-311 "authorizes wrongful death actions for heirs or personal representatives when the wrongful act or neglect of another caused the decedent's death."). Here, the Estate's common-law claims for assault, battery, negligence, and emotional distress (Counts 5-9) relate to the allegedly wrongful cause of DiMaggio's death: the shooting. *See, e.g.*, Am. Compl. ¶ 53 (defendants caused "emotional harm and physical harm leading to [DiMaggio's] death").[8] All of these claims abated upon DiMaggio's death and should be dismissed. *Farm Bureau Mut. Ins. Co. of Idaho*, 286 P.3d at 189. That leaves only the wrongful death claim (Count 4), which is itself defective for the many reasons discussed next.

### III.    Robinson Fails To Plausibly Allege A Wrongful Death Claim Under Idaho Law

The loss of any human life—whatever the cause or reason—is tragic and regrettable. But the pleadings do not plausibly suggest anything "wrongful" about DiMaggio's death. Stripped of its many "labels and conclusions," the complaint lacks "factual matter" suggesting that Hannah's rescuers acted unreasonably when they shot DiMaggio—wanted for kidnapping, double-murder, and arson—after he opened fire. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (requiring "factual

---

[8] The limited remedies available under Idaho's survivorship statute further underscore why the Estate's common-law claims did not survive DiMaggio's death. The statute "expressly limit[s]" damages to: "(i) medical expenses actually incurred, (ii) other out-of-pocket expenses actually incurred, and (iii) loss of earnings actually suffered, prior to the death of such injured person and as a result of the wrongful act or negligence." § 5-327(2); *accord Estate of Bergman v. E. Idaho Health Servs., Inc.*, No. 4:13-CV-00202-BLW, 2015 WL 506566, at *2 (D. Idaho Feb. 6, 2015). Here, the Estate does not allege that DiMaggio incurred medical expenses, out-of-pocket expenses, or lost earnings from the incident on August 10, 2013. *See generally* Am. Compl. Those damages do not and cannot exist since DiMaggio died on the scene.

content" demonstrating "more than a sheer possibility" of unlawful conduct and including more than "facts that are 'merely consistent with' a defendant's liability"); *accord Maune v. Bankers Life & Cas. Ins. Co.*, No. 4:10-CV-00074-BLW, 2010 WL 1435350, at *1 (D. Idaho Apr. 7, 2010) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

### A. Robinson Fails To Sufficiently Allege Financial Dependency On DiMaggio

Robinson has not demonstrated (as an initial matter) that she may bring a wrongful death claim.  In Idaho, only a decedent's "heirs or personal representatives on their behalf" may bring a wrongful death action.  § 5-311; *Farm Bureau Mut. Ins. Co. of Idaho*, 286 P.3d at 190 (wrongful death action may only be brought by the "heirs themselves or through an action brought by the estate on behalf of the heirs").  For siblings like Robinson, this requires demonstrating the heir was "dependent on the decedent for support or services."  § 5-311.  The "support" required under § 5-311 is "clearly in the nature of financial benefit" and does "not extend to . . . emotional and social support."  *O'Guin v. Bingham Cty.*, 72 P.3d 849, 856 (Idaho 2003).  Simply put, "[d]ependency is a *prerequisite* to suit."  *Id.*  (citing *Pfau v. Comair Holdings, Inc.*, 15 P.3d 1160, 1163-64 (Idaho 2000)) (emphasis added); *see also Nebeker*, 747 P.2d at 24 ("[T]he state objective served by our wrongful death statute is to provide for those who are most likely to suffer a loss as a result of the wrongful death.").  Here, the only allegation hinting at any dependency at all is Robinson's request for "financial support" damages.  Am. Compl. ¶ 79.  But that is exactly the sort of "naked assertion devoid of further factual enhancement" not entitled to the presumption of truth.  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  Because Robinson has not met her burden, Count 4 should be dismissed.  *Cf. O'Guin*, 72 P.3d at 856 (dismissing wrongful death claim for lack of financial dependency).

**B.  Robinson Fails To Sufficiently Allege That DiMaggio's Death Was Caused By A Wrongful Act That Was Not Justified Or Otherwise Privileged In Idaho**

Assuming Robinson is a financially-dependent "heir" for purposes of § 5-311, her allegations still do not satisfy the elements of a wrongful death claim or overcome the statutory defenses.  Idaho's wrongful death statute requires an heir to plead and prove: "(1) that an actionable wrong was committed by the defendant against the decedent, and (2) that the same actionable wrong caused the decedent's death." *Castorena v. Gen. Elec.*, 238 P.3d 209, 219 (Idaho 2010); *see also Sugai v. Gen. Motors Corp.*, 130 F. Supp. 101, 103 (D. Idaho 1955) (Section 5-311 requires plaintiff to "allege and prove" defendant is "guilty of tortious conduct"). Even if those elements can be met, "those bringing an action for wrongful death are subject to the same defenses that could have been offered had the decedent himself filed suit, such as contributory or comparative negligence." *Castorena*, 238 P.3d at 217.  This means a defendant may assert *any* defense that "could have been brought against the decedent himself."  *Id.*

Idaho provides an important defense to individuals who use deadly force in self-defense or in defense of others: civil immunity.  Idaho Code Ann. § 6-808.  This state's civil-immunity provision expressly incorporates use-of-force defenses codified in other statutes, such as Idaho's justifiable-homicide statute.  *Id.* (citing Idaho Code Ann. § 18-4009).  The justifiable-homicide provision establishes several scenarios in which deadly force is justifiable, including when "resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person."  § 18-4009(1); *see also State v. Hall*, No. 40916, 2015 WL 6159918, at *4 (Idaho Ct. App. Oct. 21, 2015).[9]  Deadly force is thus permitted "where the accused has reasonable cause to believe, and does believe, he is in danger of great bodily injury or where the

---

[9] Homicide is also justifiable "when necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed, or in lawfully suppressing any riot, or in lawfully keeping and preserving the peace."  § 18-4009(4).

-11-

person being defended is in similar danger." *State v. Rodriguez*, 460 P.2d 711, 715-16 (Idaho 1969) (citing *State v. Wilson*, 243 P. 359  (Idaho 1925)).  In the end, the analysis depends on whether the defendant "acted as a reasonable and prudent person under the same or similar circumstances." *State v. Varie*, 26 P.3d 31, 37 (Idaho 2001) (citations omitted); *see also State v. Camarillo*, 678 P.2d 102, 105 (Idaho Ct. App. 1984) ("The Idaho rule of self-defense is not premised upon a subjective test.  It is grounded in the objective concept of the actions of a 'reasonable person.'") (quoting *State v. Baker*, 644 P.2d 365 (Idaho Ct. App. 1982)).[10]

The amended complaint fails to plausibly allege that Hannah's rescuers deliberately or negligently used force that was not objectively reasonable under the circumstances.  Robinson's theory of wrongdoing is "[b]ased on" just three highly-conclusory allegations, none of which read individually or together suggest anything wrongful:

> (1) the fact that the Defendant agents excluded other officers from participating in the ground operation;
>
> (2) that the Defendant agents were, or in the exercise of reasonable care should have been, aware that JAMES LEE DIMAGGIO was not aware of their presence and was attempting to get rescued when he fired a shot into the air; and
>
> (3) the Defendant agents' failure to take reasonable efforts to apprehend JAMES LEE DIMAGGIO without the use of excessive force prior to the time that he fired the shot into the air . . . .

Am. Compl. ¶ 43.  From those three "facts," Plaintiff's draw the following conclusions:

> Plaintiffs believe and allege that the Defendant FBI agents were so enraged by the as yet unproven underlying allegations of wrongdoing against JAMES LEE DIMAGGIO, that they were overwhelmed by passion, resulting in their mission

---

[10] Even though the Idaho Tort Claims Act also provides immunity to state and local law enforcement officers in cases like this one, Idaho Code Ann. § 6-904, those provisions arguably do not apply here.  *See Tekle v. United States*, 511 F.3d 839, 852 (9th Cir. 2007) (observing that the Supreme Court "stated in no uncertain terms that we erred by restricting the FTCA to the liability of government entities"); *but see Ting v. United States*, 927 F.2d 1504, 1514 (9th Cir. 1991) ("[T]he proper source for determining the government's liability is not the law of citizen's arrests, but rather the law governing arrests pursuant to warrants.") (internal citations omitted).

being more akin to an execution than a mission to rescue and apprehend, and that the Defendant FBI agents intentionally excluded all other law enforcement officers from the ground "rescue" operations so that they would not be closely monitored and could not be prevented from using excessive force against JAMES LEE DIMAGGIO.

*Id.* These inferences are simply not plausible.

The first inference Robinson draws—that non-FBI personnel were deliberately excluded from the rescue-mission so that the FBI would not be monitored or seen executing DiMaggio in cold blood—is not "plausibly establish[ed]" given (far) "more likely explanations." *Iqbal*, 556 U.S. at 681; *see also Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001) (courts are not required to make "unreasonable inferences" or "unwarranted deductions of fact" to save a complaint from dismissal). DiMaggio was suspected of kidnapping a sixteen-year-old girl, torturing and incinerating the girl's family, and then absconding with her more than 1000 miles from the Mexican border to the Frank Church Wilderness. *See generally* Am. Compl.; *see also* Exhs. A-F. Authorities were facing an active hostage-crisis playing out in rugged mountain terrain by a suspected armed and dangerous killer.[11] That is precisely why it fell to FBI's Hostage Rescue Team to conduct Hannah's rescue mission.[12] The only plausible inference that can be drawn

---

[11] The Frank Church Wilderness is part of the Salmon-Challis National Forest and spans more than two millions acres. USDA Forest Service, Frank Church River of No Return Wilderness, http://www.fs.usda.gov/detail/scnf/specialplaces/?cid= stelprdb5360033. It is "the largest contiguous wilderness in the Lower 48 [states] . . . ." *Id.* The terrain is marked by "steep, rugged mountains, deep canyons, and wild, whitewater rivers." *Id.* The Court may take judicial notice of these facts. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010) (taking notice of information in government websites) (collecting cases).

[12] The very purpose of the Hostage Rescue Team is responding to "terrorist incidents, hostage situations, and major criminal threats." FBI, www.fbi.gov/news/stories/2013/february (follow "The Hostage Rescue Team: 30 Years of Service" hyperlink). Simply put, it "possesses capabilities that do not exist anywhere else in civilian law enforcement." *Id.* These facts are also judicially noticeable. *See Daniels-Hall*, 629 F.3d at 998-99.

-13-

from the fact that FBI rescuers went alone is that they were the most capable unit to rescue

Hannah in these treacherous conditions.  *See Sprewell*, 266 F.3d at 988 (courts may discard

"allegations that contradict matters properly subject to judicial notice or by exhibit").

    The next allegation from which Robinson draws equally implausible inferences is that

"the Defendant agents were, or in the exercise of reasonable care should have been, aware that

JAMES LEE DIMAGGIO was not aware of their presence and was attempting to get rescued

when he fired a shot into the air."  Am. Compl. ¶ 43.  After stripping away the labels and

conclusions, what remains is the implausible inference that DiMaggio was unjustifiably killed as

he allegedly signaled for "rescue"—by firing his gun.  That inference (*rescue* from who? from

what? by firing a gun?) is patently incredible.

    Among other things, the inference does not square with the fact that DiMaggio hid his car

under "layers of brush"—more than 1000 miles from where officers had reason to believe he

kidnapped Hannah and torched his own house containing the bludgeoned bodies of Hannah's

mother and brother.  Am. Compl. ¶ 36.  Nor does it square with the fact that DiMaggio did not

seek help from the horseback riders he encountered.  Am.  Comp. ¶¶ 33-35.  Most bizarrely, it

does not square with the fact that DiMaggio apparently knew he was surrounded by armed

officers when he opened fire.  *See, e.g.*, Am. Compl. ¶ 95 (DiMaggio "suffer[ed] a reasonable

apprehension that he would be severely killed or injured" when defendants "surrounded him"

and "point[ed] firearms in his direction").[13]  Why would DiMaggio shoot instead of dropping his

weapon, raising his hands, and calling for help?  Yet even setting aside the implausibility of the

allegation and assuming its truth, reasonable law enforcement officers would not be expected to

---

[13] The allegation that DiMaggio was "not aware of [the rescuers'] presence" when he was
shooting the gun, Am. Compl. ¶ 43, is it flatly contradicted by the *assault* claim (Count 8)
alleging the exact opposite, *see* Am. Compl. ¶¶ 93-96.

know that firing a gun was intended as a distress signal rather than a hostile and dangerous act. *Cf. Hunter v. Bryant*, 502 U.S. 224, 228 (1991) ("[T]he court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed . . . ."); *Iqbal*, 556 U.S. at 679 (assessing a claim's plausibility "requires the reviewing court to draw on its judicial experience and common sense"). The "common sense" explanation for the rescuers' response to the gunshots—indeed, the one suggested by Hannah's (unedited) "Today" show interview—was that DiMaggio had "lowered" his gun and was shooting at them. *Cf. Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295–96 (9th Cir. 1998) ("[W]e are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint.").

Though not included among Robinson's three primary facts, *see* Am. Compl. ¶ 43, the separate allegation that "both" Hannah and DiMaggio were seen on video "waiving [sic] pieces of cloth" to flag down a rescue plane, *id.* at ¶ 38, can also be ignored. The allegation simply can't be true: the publicly-released surveillance video actually shows only Hannah—not DiMaggio—signaling the plane. *Cf. Scott v. Harris*, 550 U.S. 372, 380-81 (2007) ("The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."); *accord Tortolano v. Poulson*, No. 1:13-CV-00438-EJL, 2015 WL 4623799, at *6 (D. Idaho Aug. 3, 2015) (courts need not "accept obvious fictions").[14] But even if DiMaggio himself were waving, it would still not matter: he later sent an entirely different—

---

[14] *See also Wicklund v. Page*, No. 1:09-CV-671-EJL-CWD, 2012 WL 3647960, at *12 (D. Idaho July 18, 2012) report and recommendation adopted, No. 1:09-CV-00671-EJL, 2012 WL 3651138 (D. Idaho Aug. 23, 2012) ("Wicklund's version of events is, as in *Scott*, so utterly discredited by the record [and video evidence] that no reasonable jury could believe him.") (citing *Scott v. Illinois*, 440 U.S. 367, 380 (1979)). If DiMaggio truly wanted to seek help from the rescue plane, he would have joined Hannah (and found something big to wave—*e.g.*, a tree branch). *That* would have been a universally-recognizable "SOS" signal. In short, the allegation is contradicted by the video Plaintiffs incorporated by reference in their complaint.

and threatening—message when he began shooting as the rescuers approached.  Am. Compl.  ¶¶
40-42.  Not only would any reasonable rescuer interpret those shots (even a single shot) as a
threat to his safety or Hannah's, but firing under these conditions was inherently reckless and
separately bars the claim.  *See Bevan v. Vassar Farms, Inc.*, 793 P.2d 711, 715 (Idaho 1990)
(decedent's comparative fault barred parents' wrongful death recovery against defendant).

     Robinson's third key fact—that "Defendant agents' failure to take reasonable efforts to
apprehend JAMES LEE DIMAGGIO without the use of excessive force prior to the time that he
fired the shot into the air . . . ."—suffers from more of the same conclusory language.  Am.
Compl. ¶ 43.  Robinson does not plead or hint at what "reasonable efforts" the officers should (or
could) have taken under these high-pressure, fast-moving circumstances.  *Id.*  DiMaggio was
firing his weapon in the presence of a child and her approaching rescuers.  Maybe Robinson
thinks the rescuers should have waited for DiMaggio to cease firing—praying that he did not
injure or kill them or Hannah in the meantime.  No reasonable officer would or should take that
risk.  *Cf. Garcia v. Santa Clara Cty.*, 268 F. App'x 588, 589 (9th Cir. 2008) ("Maybe [plaintiff]
reacquired the gun for some benign purpose as he approached the dead end, but [the officer]
'need not have taken that chance and hoped for the best.'") (quoting *Scott*, 550 U.S. 372);
*Billington v. Smith*, 292 F.3d 1177, 1185 (9th Cir. 2002) ("Maybe [the officer] could have hoped
that [plaintiff] simply wanted to disarm him, not shoot him, but that would have been a
gamble.").[15]  Given the horrifying events of the previous seven days, the rescuers instead had
every reason to believe that DiMaggio was about to harm or kill them or Hannah—or ignite the

---

[15] Had Hannah been killed by DiMaggio as officers patiently waited for him to stop
shooting, the government might instead be defending a wrongful death suit brought by *Hannah's*
family.  When a defendant faces "the choice between two evils," it is appropriate to weigh the
"relative culpability" of the parties involved to determine whether deadly force was reasonable.
*Scott*, 550 U.S. at 384.  The analysis here is simple: DiMaggio was a suspected killer and
kidnapper firing a gun as rescuers approached him and the girl they were sent to rescue.

campsite at the press of a button.  The only plausible inference from these facts is that rescuers

quickly and appropriately responded to gunshots fired by a suspected killer, arsonist, and child-

abductor.  *See Sprewell*, 266 F.3d at 988 ("We have held that a plaintiff can . . . plead himself out

of a claim by including unnecessary details contrary to his claims.") (collecting cases).

     Not only does Robinson fail to plausibly allege a wrongful death claim under Idaho law,

analogous constitutional standards are instructive and lend further justification to the reasonable

actions taken by Hannah's rescuers.[16]  The test for whether force is reasonable under the Fourth

Amendment depends on the "circumstances of each particular case, including the [1] severity of

the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers

or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight."

*Graham v. Connor*, 490 U.S. 386, 396 (1989).  It also "must embody allowance for the fact that

police officers are often forced to make split-second judgments—in circumstances that are tense,

uncertain, and rapidly evolving—about the amount of force that is necessary in a particular

situation."  *Id*. at 396-97.  Just like Idaho's civil-immunity statute, "[t]he appropriate inquiry is

whether the officers acted reasonably, not whether they had less intrusive alternatives available

to them."  *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) (collecting cases).

     This case checks all the boxes—and more.  DiMaggio was suspected of committing

several *heinous crimes* during the course of an ongoing kidnapping: arson, torture, and double-

murder.  Am. Compl. ¶¶ 24-32; *see also* Exh. E (authorities believed DiMaggio posed a "grave"

---

[16] Courts often look to the application of the Fourth Amendment in the excessive-force
context to determine whether the use of deadly force was reasonable under state law.  *See e.g.*,
*Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1170 (9th Cir. 2011) ("[T]he Fourth Amendment
violation alleged by [plaintiff] also suffices to establish the breach of a duty of care under
California law."); *Estate of Crawley v. McRae*, No. 1:13-CV-02042-LJO, 2015 WL 5432787, at
*40 (E.D. Cal. Sept. 15, 2015) (In fatal shooting cases, "[s]tate law claims for battery are
coextensive with claims for excessive force under the Fourth Amendment.") (collecting cases).

and "significant danger" to the community, law enforcement, and Hannah).  *Cf. Johnson v. Cty. of Los Angeles*, 340 F.3d 787, 793 (9th Cir. 2003) (holding that the use of force resulting in paraplegia was "objectively reasonable" where "armed robbery suspects pose[d] an obvious and significant danger to the police and others").  He had eluded authorities for a *week*, ditching (and hiding) his car in the vast Idaho wilderness before hunkering down more than *1000 miles* away from where he was suspected of kidnapping Hannah and murdering her family.  Am. Compl. ¶¶ 36-38.  *Cf. Forrett v. Richardson*, 112 F.3d 416, 418-420 (9th Cir. 1997) (where police found "violent residential burglary" suspect on the street, then chased him for "almost an hour," deadly force was justified to prevent escape).  Then as rescuers approached his location, DiMaggio fired *two shots*.  Am. Compl. ¶¶ 40-42 (incorporating "Today" interview); Exh. F ("Today" interview).  *Cf. Long v. City & Cty. of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) (use of deadly force on agitated suspect who was yelling threats and who officer believed was shooting at other officers was reasonable).  This is *exactly* the situation the Supreme Court contemplated would justify the use of deadly force.  *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (deadly force is reasonable "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others"); *accord Scott*, 550 U.S. at 382 (deadly force may be used to apprehend a dangerous criminal if "his mere being at large poses an *inherent danger* to society") (citing *Garner*, 471 U.S. at 11) (emphasis added).

Even without incorporating Hannah's unabridged account of what actually happened or taking judicial notice of the public record, the complaint alone demonstrates that DiMaggio—a suspected double-murderer, arsonist, and child-abductor who was firing gunshots (whatever the direction) in the presence of his hostage and her approaching rescuers—was the definition of an "inherent danger."  *Cf. Garcia*, 268 F. App'x at 589 ("Even if [plaintiff] were running directly

away from [the officer] when the bullet struck, uncontradicted facts in the record demonstrate that [the officer] had 'probable cause to believe that [plaintiff] pose[d] a significant threat of death or serious physical injury,' rendering [the officer's] use of deadly force constitutionally reasonable.'") (quoting *Garner*, 471 U.S. at 3); *Forrett*, 112 F.3d at 421 (deadly force was reasonable where suspect "demonstrated [a] willingness to take desperate measures" and might "seize an opportunity to take an innocent bystander hostage") (citing *Kinney v. Indiana Youth Ctr.*, 950 F.2d 462, 465-66 (7th Cir. 1991) (deadly force against escaping prisoners necessary to prevent taking of hostages)); *Henrich*, at 39 F.3d at 914-15 (use of deadly force was reasonable where suspect who fired shots and was "acting crazy" then "pointed" gun at officers).[17]  Count 4 should be dismissed because the non-conclusory facts, taken as true, show no wrongdoing at all. *See Hydrick v. Hunter*, 669 F.3d 937, 941 (9th Cir. 2012) (reversing court and dismissing damages-suit because "[p]laintiffs pleaded insufficient facts to establish 'plausible' claims").[18]

---

[17] Regardless of whether DiMaggio lowered his weapon and fired a second shot, he could have turned the gun on Hannah or her rescuers in a heartbeat.  *See Estate of Martinez v. City of Fed. Way*, 105 F. App'x 897, 898 (9th Cir. 2004) ("Whether Martinez's finger was on the trigger is irrelevant.  Even if Martinez's finger was not on the trigger, it would only take a fraction of a second for him to place it there."); *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001) ("This Circuit has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action."); *Montoute v. Carr*, 114 F.3d 181, 185 (11th Cir. 1997) ("[A]n officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force."); *Leong v. City of Detroit*, 151 F. Supp. 2d 858, 866 (E.D. Mich. 2001) ("Plainly, an armed and gun-wielding suspect can turn and train his weapon on an officer or bystander in an instant, with disastrous consequences.  This Court is aware of no case, and Plaintiff has not cited one, which would compel a police officer to await such an occurrence, despite otherwise having determined that a suspect is armed and poses an imminent threat of serious harm to the officers or others in the vicinity.").

[18] Robinson also claims that the rescuers unlawfully killed DiMaggio because they were "enraged" and "overwhelmed by passion."  Am. Compl. ¶ 43.  These state-of-mind allegations are both conclusory and irrelevant to whether Hannah's rescuers were legally justified in neutralizing an active shooter.  *See Graham*, 490 U.S. at 397-99 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force . . . ." and "subjective concepts like 'malice' and 'sadism' have no proper place in that inquiry.").

While Count 4 should be dismissed in its entirety, at a minimum the Court should strike Robinson's request for "exemplary damages." Am. Compl. ¶ 80. Punitive damages are statutorily prohibited in an FTCA action. 28 U.S.C. § 2674; *Krieg v. Mills*, 8 F. App'x 663, 665 (9th Cir. 2001). The Court should also strike Robinson's request for damages based on DiMaggio's "emotional harm and physical harm leading to his death." Am. Compl. ¶ 79. It is well-settled in Idaho that "an action for pain and suffering under I.C. § 5–311 does not survive death." *Vulk v. Haley*, 736 P.2d 1309, 1312 (Idaho 1987) (affirming dismissal of pain and suffering claims); *accord Farm Bureau Mut. Ins. Co. of Idaho*, 286 P.3d at 189.[19]

## CONCLUSION

The claims against the United States should be dismissed with prejudice.


Dated: May 2, 2016                          Respectfully submitted,

                                            BENJAMIN C. MIZER
                                            Principal Deputy Assistant Attorney General

                                            RUPA BHATTACHARYYA
                                            Director
                                            Torts Branch, Civil Division

                                            ANDREA W. MCCARTHY
                                            Senior Trial Counsel
                                            Torts Branch, Civil Division

                                            */s/ David G. Cutler*
                                            DAVID G. CUTLER
                                            Illinois State Bar No. 6303130
                                            United States Department of Justice
                                            Torts Branch, Civil Division
                                            P.O. Box 7146
                                            Washington, D.C. 20044-7146

---

[19] A dismissal of the FTCA action would also trigger the FTCA judgment bar, resulting in the dismissal of the constitutional claims against the individual Doe defendants. 28 U.S.C. § 2676; *Gasho*, 39 F.3d at 1437-38.

Tel: (202) 616-0674
Fax: (202) 616-4314
Email: david.g.cutler@usdoj.gov

WENDY J. OLSON
United States Attorney

NICHOLAS J. WOYCHICK
Idaho State Bar No. 3912
Assistant United States Attorney
District Of Idaho
Washington Group Plaza IV
800 East Park Boulevard, Suite 600
Boise, ID 83712-7788
Tel: (208) 334-1211
Fax:    (208) 334-1414
Email: Nick.Woychick@usdoj.gov

*Attorneys for the United States*